J-S22018-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.R.-H. AND I.R.-H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1606 MDA 2016 |

Appeal from the Decree August 23, 2016
In the Court of Common Pleas of Berks County
Orphans' Court at No(s):  84695 and 84696

BEFORE:   SHOGAN, MOULTON, and PLATT[*], JJ.

MEMORANDUM BY MOULTON, J.:                    **FILED MAY 01, 2017**

Appellant, D.H. ("Father"), appeals from the decrees entered August 23, 2016, in the Berks County Court of Common Pleas granting the petitions of the Berks County Children and Youth Services ("BCCYS") and involuntarily terminating Father's parental rights to his daughters, A.J.R.-H.,[1] born in March 2007, and I.G.H., born in July 2010 (collectively, "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2]  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] At the hearing, A.J.R.-H.'s name was corrected from A.J.H. to A.J.R.-H.  N.T., 8/12/16, at 15.

[2] The parental rights of K.J.R. ("Mother") as to Children were also terminated on the same date by separate decrees.  Mother filed a timely
*(Footnote Continued Next Page)*

The trial court summarized the relevant procedural and factual history, in part, as follows:

The family first came to the attention of BCCYS in 2007, the day after A.[J.]R.-H. was born, as the result of a report that alleged a lack of emotional involvement by Father, concerns of Father's abusiveness and alcohol use, and a concern about where the family resided. BCCYS determined the risk to be low and took the report as information only.

A second report, on February 21, 2013, alleged Mother's daily smoking of marijuana and Father's incarceration for domestic violence. The report alleged that Mother suffered from mental health issues and she was not appropriately feeding and supervising the Children. Again, BCCYS determined the risk to be low and took the report as information only.

An intake investigation began on September 23, 2013 upon a third report that alleged Mother and Father were using drugs and that Father had a history of domestic violence and incarceration. Allegations included a 2012 assault by Father on Mother in which he broke her nose and for which he was re-incarcerated. During Father's incarceration, Mother needed assistance with heat for the home, food, diapers, and gas for her car.

The investigation revealed a lengthy history of domestic violence and abuse between Mother and Father. Mother revealed that Father drank beer one or two times per week, but added that he was angry even when sober. Mother did not want to leave Father despite his having broken her nose and on another occasion putting a gun to her head. There were other instances of physical abuse and daily verbal abuse. The Children also reported the abuse and repeated Father's claims that he was going to

_(Footnote Continued)_ ———————————————

appeal in this Court at Docket No. 1564 MDA 2016, which we address by separate memorandum.

kill Mother. BCCYS learned that Father failed to complete counseling and other services and otherwise violated the requirements of his parole on several occasions. Father's abuse of Mother led to parole violations, new charges, and a temporary Protection From Abuse ("PFA") order.

BCCYS filed for dependency of the Children on December 31, 2013. Allegations included histories of domestic violence and drug use by Mother and Father; Mother's needing assistance with heat, food, and diapers; Father's criminal history; and failure to cooperate with offered services.

The hearing on the dependency petition, originally scheduled for February 6, 2014 was continued to February 21, 2014, then April 3, 2014. In the interim, Mother and Father were ordered to cooperate with domestic violence counseling and casework services. Father had supervised visits with the Children, and was not permitted in the family home. There was less than full cooperation with services and prohibition of contact. Mother and Father demonstrated a lack of insight into why BCCYS was involved.

On April 3, 2014, the Court found the Children to be dependent due to severe domestic violence between Mother and Father. Physical custody of the Children remained with Mother. Father was to have no unsupervised contact with the Children. Mother and Father were ordered to participate in services such as domestic violence counseling, drug and alcohol evaluation and treatment, casework services, and establishing and maintaining stable and appropriate housing and income. On August 13, 2014, Father was permitted to have unsupervised contact with the Children, but he remained excluded from the family home until October 14, 2014. During this time, Mother and Father were moderately compliant with the permanency plan.

On November 17, 2014, the Court removed the Children from the home and transferred legal custody to

BCCYS for placement purposes.[3]   The primary goal of return to Mother was established, with a concurrent goal of adoption.  Mother and Father were permitted twice weekly visits with the Children and were ordered to participate in services including parenting education; mental health treatment; domestic violence treatment; drug and alcohol evaluation screening, and treatment; casework services; visitation; and establish and maintain appropriate housing and income.  By Order dated February 11, 2015, Mother's visits were reduced to once per week.

At a permanency review hearing held May 5, 2015, Mother and Father were found to be minimally compliant with services.  Visits with the Children were reduced to bi-weekly.

After a number of continuances, the next review hearing was held February 19, 2016.  Mother and Father were found to have been moderately compliant with the permanency plan, but they made minimal progress toward alleviating the circumstances that led to the Children's placement.   No changes were made in the ordered services. . . .

Trial Court Opinion, 10/25/16, at 4-7 ("1925(a) Op.") (footnotes omitted).

On February 19, 2016, BCCYS filed petitions to terminate parental rights.  On August 12, 2016, the trial court held a hearing on the termination petitions.   BCCYS presented the testimony of: Andrea Karlunas, licensed social worker, certified sex offender treatment specialist, and certified domestic violence counselor, who treated Mother and evaluated the Children;[4] Nicole Kauffman-Jacoby, BCCYS caseworker; and Sloane

---

[3] The Children were placed in kinship care with their maternal grandmother and her husband upon removal.

[4] BCCYS presented Ms. Karlunas as an expert.

Radcliffe, Child Prep worker.[5]  In addition, Mother and Father, who were both represented by counsel, each testified on their own behalf.  By decree entered August 23, 2016, the trial court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  On September 21, 2016, Father, through counsel, filed a timely notice of appeal.[6, 7]

_____

[5] The guardian *ad litem* appointed to represent the Children argued in favor of termination.  N.T., 8/12/16, at 194-95.

[6] The trial court entered separate decrees terminating Father's parental rights to Children.  Father improperly filed only one notice of appeal and one concise statement of errors complained of on appeal from the decrees.  **See** Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves [sic] issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). Because Father's arguments on appeal are identical as to Children, we discern no prejudice arising from his procedural misstep.  Therefore, we decline to quash or dismiss Father's appeal.

[7] Father did not file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) with his notice appeal. Father filed a concise statement with this Court on November 23, 2016.  By order dated November 29, 2016, Father was ordered to file a statement with the trial court and serve the trial judge and other parties within 10 days.  By subsequent order dated December 28, 2016, after non-compliance with the above order and another order with regard to appellate briefs, this matter was remanded to the trial court to determine whether counsel abandoned Father and to take further action as necessary to protect Father's appellate rights.  On January 11, 2017, the trial court determined that counsel had failed to comply with this Court's order, but that counsel presented medical excuses for some period of the time in question.  Father wished for counsel to remain, and no sanctions were imposed.

Despite Father's procedural missteps with regard to his concise statement, we decline to find waiver due to a lack of prejudice.  **See In re**

*(Footnote Continued Next Page)*

On appeal, Father raises the following issues for our review:

A. Whether the trial court erred in its evidentiary ruling admitting a 1200 page packet containing 168 documents, most of which were inadmissible hearsay?

B. Whether the lower court erred in determining that [BCCYS] met its statutory burden of proof regarding termination of parental rights?

C. Whether the evidence that was presented by BCCYS was not substantial and credible evidence sufficient to support the court's decision?

Father's Br. at 9 (unnecessary capitalization omitted).

We first address Father's second and third issues, which in essence challenge the sufficiency of the evidence in terminating his parental rights. Father's Br. at 22-29. In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because

*(Footnote Continued)* ─────────────

*K.T.E.L.*, 983 A.2d 745, 748 (Pa.Super. 2009) (holding that an appellant's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party). We observe that Mother essentially preserved the same claims eventually raised by Father, which were addressed by the trial court on appeal.

the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

As our Supreme Court has further explained:

[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (internal citations omitted). "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (quoting *In re Diaz*, 669 A.2d 372, 375 (Pa.Super. 1995)). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or

- 8 -

> subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> [T]o terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216

- 9 -

(Pa.Super. 2015) (quoting **In re A.L.D**., 797 A.2d 326, 337 (Pa.Super. 2002)).

In this case, in finding sufficient evidence supporting termination, the trial court stated as follows:

> In his first domestic violence evaluation, Father identified himself as a "woman abuser." He struggled with self-esteem, mood management, and the consequences of his behaviors. Although he was able to acknowledge certain incidents of abuse toward Mother, he lacked insight into the danger he posed to the Children's well-being and why BCCYS was involved with him and his family. Through the entire history of the underlying dependency matter, Father minimized how his actions led to the Children's being adjudicated dependent and being removed from his and Mother's custody. At the termination hearing, Father was unable to acknowledge the veracity of varied allegations of abuse, and was generally incredible with his testimony. Based upon the entire record, it appears that at all times Father has blamed Mother and her drug use for his actions and the break-up of the family. Father has not provided proof that he successfully completed domestic violence treatment, and his testimony at the termination hearing demonstrated to the Court that he still has not acquired insight into the causes and consequences of his behaviors.

> In short, Father has had over one year to remedy the circumstances that led to the removal and placement of the Children but has failed to do so. He has not fully availed himself of the services available to him and the continued provision of services to him does not appear to be reasonably likely to effect a meaningful change in his insight and behavior. His inability or refusal to change his way of looking at the world and more specifically the dynamic within his family has left the Children without essential parental care, control, and subsistence necessary for their physical, mental, and emotional well-being. All of this further summed as a general failure to perform his parental duties.

- 10 -

1925(a) Op. at 7-8.

The record supports the trial court's termination of Father's parental rights pursuant to Section 2511(a)(2). Children were removed from parental care on November 17, 2014, a period of approximately twenty-one months at the time of the termination hearing, due to issues of domestic violence and substance abuse. N.T., 8/12/16, at 57, 61-62, 66, 100, 107. Although Father attended domestic violence treatment, he was discharged due to lack of progress. *Id.* at 83. Further, despite successful discharge from dual diagnosis treatment there were concerns about Father's ability to exhibit and demonstrate what he learned in real life situations. *Id.* at 83-84. Moreover, Andrea Karlunas, licensed social worker, certified sex offender treatment specialist, and certified domestic violence counselor, who treated Mother and evaluated the Children,[8] testified to a lack of insight, stating:

> It's my understanding that [Father] was never able to move past blaming and he was never able to demonstrate any empathy or insight into how his behavior affected his children. There were concerns about ongoing violence despite the fact that he was under external measures through Berks County Adult Probation and Parole Department as well as through [BCCYS]. And despite those external measures he continued to act out.

_____

[8] Ms. Karlunas was part of the treatment team, which would meet weekly to discuss clinical supervision of cases, including Father's. N.T., 8/12/16, at 40-41.

*Id.* at 41. BCCYS caseworker, Nicole Kauffman-Jacoby, confirmed Father's failure to accept responsibility for his behaviors and the family's situation. *Id.* at 85-86.

> During casework services when I got the case I met with [Father] [and] tried to discuss it and the history. He blamed everything on [Mother]. He blamed her drug use for her violence. He blamed BCCYS and law enforcement and [sic] misunderstanding and misrepresenting him. He took no responsibility for his actions that [led] to the placement of the children.

*Id.* at 86. At the hearing, Father only admitted to one argument with Mother regarding drug use. *Id.* at 145-46. Recognizing this lack of insight, Ms. Karlunas suggested, "[N]either parent has resolved their domestic violence issues. If they cannot resolve their own issue, this cycle is going to continue and further traumatize these children." *Id.* at 36-37. Ms. Kauffman-Jacoby, noting a lack of progress, echoed this prediction, stating: "There is a high likelihood the cycle will repeat and ongoing domestic violence will be possible and will affect the children." *Id.* at 85.

Therefore, the record supports the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.*

We next determine whether termination was proper under Section 2511(b). With regard to Section 2511(b), we have stated as follows:

- 12 -

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation marks and citations omitted) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)).

In determining that termination of Father's parental rights favored Children's needs and welfare, the trial court concluded:

> Having determined that it is clear that Mother and Father have failed to perform their parental duties for well more than six months, and grounds for the termination of their parental rights exist under 2511 (a), the Court turned its attention to the best interests of the Children. The Children have a positive bond with their foster family. They feel safe in the foster environment. They wish to stay in that environment and do not want to return to Mother and Father and their family home. The Children do not feel safe with Mother and Father. To the extent a bond

> exists between the Children and Mother and Father, it is an unhealthy one at best. The Children suffered significant trauma caused by Mother and Father for which they continue to be in counseling. The Children deserve an opportunity to experience trauma-free life in a permanent, healthy, safe home where their rights to the fulfillment of their potential can be met.
>
> For the foregoing reasons, the Court concluded that termination of Mother and Father's parental rights to the Children was proper and in their best interests.

1925(a) Op. at 10.

The record supports the trial court's finding that terminating Father's parental rights would best serve the needs and welfare of Children. When questioned about psychological damage to Children as a result of the domestic violence between their parents, Ms. Karlunas testified that Children "suffered some definite damage due to what they have been exposed to." N.T., 8/12/16, at 68. Children initially presented with negative behaviors, including avoidance, defiance and anger, as well as bed-wetting. *Id.* at 33-34, 87. I.G.H. also would not sleep by herself, and exhibited stuffed animal attachment, fears regarding her future and whether her grandparents were going to die, and stress transitioning. *Id.* at 43-44, 87. However, Ms. Karlunas observed improvement in both children since placement. *Id.* at 46.

Additionally, Ms. Kauffman-Jacoby recounted what can best be described as an awkward relationship between Father and Children. As to the bond between Father and Children, she testified as follows:

> Q. And how would you describe the bond with the father?

A. Initially they don't want to go to visits with father. Once they are there they are okay. But they are very off-standish [sic] with him.

. . .

Q. Do [they] hug him? Do they kiss him? Do they shy away?

A. They shy away initially. And then he is pretty persistent. They will hug and kiss and walk away. They will try to distract him by looking at other things in the room.

*Id.* at 91-92. Ms. Kauffman-Jacoby explained that Father would press Children during visitation, which was a concern.

There were concerns noted during visitation that he would sort of coach, not sort of, he would coach the children to ask for more visitation. He would kind of badger them about, "Do you love me? You have to tell them you want to come home." He would make false promises to them he would not be able to fulfill. And this has been, has been since placement of the children.

*Id.* at 84. Ms. Kauffman-Jacoby also referenced inappropriate cards and correspondence forwarded directly to Children in which Father made false promises that they were going to come home and indicating that he would not stop fighting until they came home which would incite fear and negative behaviors in Children. *Id.* at 95.

Conversely, Ms. Karlunas stated that the Children "talk about their grandparents as their stable support givers." *Id.* 57. As to I.G.H. and her grandparents, Ms. Karlunas indicated she was "very bonded and well[-]adjusted and building security." *Id.* at 45-46. Similarly, Ms. Kauffman-Jacoby noted a positive relationship between the Children and their

- 15 -

grandparents. *Id.* at 89. When asked to describe the interaction between Children and their grandparents, she testified, "They respond very well to their grandparents. They are easily redirected. They are very loving and affectionate with their grandparents. Every time I am there they given them hugs. They give them kisses. They look to them to meet their needs. If they ask for snacks, they get snacks. They are very receptive." *Id.* She further labeled the bond between them as a "healthy[-]type bond." *Id.* Moreover, Children reported feeling unsafe with their parents and safe with their grandparents. *Id.* at 117-18, 128-29. As reported by Ms. Kauffman-Jacoby, "[Children] like living with their grandparents. We discussed safety. And they feel safe living with their grandparents, they feel stable there." *Id.* at 117.

Ms. Karlunas opined that Children "need[] a safe, stable environment to continue their progress" and "moving toward and proceeding toward permanency would help the children." *Id.* at 69. Further, Ms. Kauffman-Jacoby offered that "[b]ased on therapeutic recommendation reunification is not in the children's best interest." *Id.* at 118. She reported "no concerns" regarding the termination of parental rights as a detriment to Children. *Id.* at 92. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *R.J.S.,* 901 A.2d at 513.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Lastly, we review Father's evidentiary claim with regard to BCCYS' packet of 168 exhibits admitted by the trial court. Father argues that exhibits presented contained multiple layers of hearsay and were not appropriately authenticated to be admissible under the business records exception to the hearsay rule. Father's Br. at 19-20. He maintains that "[w]ithout evidence of the sources of information and the time and manner of preparation," the proffered evidence did not qualify under the business record exception. *Id.* at 21 (citation omitted). "Although considerable weight is given to the findings of fact by the trial court on appeal, where the trial court bases its findings upon such unreliable testimony, the decree of termination should be vacated." *Id.* (citation omitted).

"Our standard of review relative to the admission of evidence is for an abuse of discretion." ***Commonwealth v. Wantz***, 84 A.3d 324, 336 (Pa.Super. 2014); ***see also In re Adoption of R.K.Y.***, 72 A.3d 669, 675 (Pa.Super. 2013).

Hearsay is an out-of-court statement offered for the truth of the matter asserted. Pa.R.E. 801. Unless the statement is not being offered for its truth or it falls within a hearsay exception, it is inadmissible. Pa.R.E. 802. As to the business records exception to the hearsay rule, Pa.R.E. 803(6) provides:

(6) *Records of a Regularly Conducted Activity.* A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

**See also** 42 Pa.C.S. § 6108(b).

An evidentiary error will be deemed harmless if:

(1) the error did not prejudice the defendant or the prejudice was *de minimus*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence . . . was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Markman**, 916 A.2d 586, 603 (Pa. 2007). **See**

**Foflygen v. Allegheny General Hospital**, 723 A.2d 705, 708 (Pa.Super.)

("[Evidentiary] rulings must be shown to have been not only erroneous but

also harmful to the complaining part[y].”), ***appeal denied***, 740 A.2d 233 (Pa. 1999).

The trial court admitted the BCCYS case file under the business records exception, but made no determination as to whether the additional hearsay statements contained within the file also qualified for an exception to the hearsay rule.  Father argues that this packet included a typed case summary, which was inadmissible.  Father, however, does not argue that he was harmed by the summary's admission, particularly as the testimony presented at the hearing provided sufficient support for the termination of his parental rights.  Further, to the extent the packet included additional hearsay statements, Father fails to identify the inadmissible hearsay or how its admission caused him harm.

We, therefore, affirm the decrees terminating Father's parental rights.

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/1/2017